UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                   **Hon. Hugh B. Scott**

       v.           09CR329A

                   **Decision
&
Order**

Thamud Eldridge, Kashika Speed,
Kevin Allen, and Galen Rose,

       Defendants.

Before the Court are the following motions seeking various types of relief: on behalf of defendant Thamud Eldridge ("Eldridge") (Docket Nos. 80, 88, 100, 147, 168, 170, and 187); on behalf of defendant Kashika Speed ("Speed") (Docket Nos. 78, 101 and 142); on behalf of defendant Galen Rose ("Rose") (Docket Nos. 79, 98, 99, 143, 144, and 190); and on behalf of defendant Kevin Allen ("Allen") (Docket No. 148). Also before the Court are the government's motion to compel defendant Eldridge to appear in a lineup (Docket No. 81); as well as the government's motion to compel defendant Speed to provide DNA samples (Docket No. 82).[1]

---

[1] The defendants requested the bifurcation of pretrial motions in this case. (Docket No. 39). The motion was granted. (Docket No. 40). The non-dispositive motions relating to pretrial discovery issues were previously resolved in an Order dated 9/20/2010. (Docket No. 68). Notwithstanding, the subsequent round of motions did raise additional non-dispositive issues discussed herein. The dispositive motions raised by the defendants in the respective motions are the subject of a separate Report and Recommendation.

1

**CHARGES**

On June 20, 2012[2], the Grand Jury for the Western District of New York issued a Superceding Indictment (Docket No. 164) in which defendants Eldridge, Speed and Allen are charged with racketeering activity in violation of Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1961(1) and §1961(5) [Count 1]. Among the racketeering acts alleged are: the conspiracy to distribute controlled substances [Act One]; attempted robbery of Victim A [Act Two]; attempted robbery at 87 Girard [Act Three]; robbery and kidnapping of Victim B [Act Four]; robbery of Victim C [Act Five]; the murder and conspiracy to commit robbery of Thedrus Laster ("Laster") [Act Six]; and the murder and conspiracy to commit robbery of Sam Jones ("Jones")[Act Seven]. Defendants Eldridge, Speed and Allen are also charged with conspiracy to commit racketeering in violation of 18 U.S.C. §1962(d) [Count 2]; conspiracy to possess and distribute various controlled substances in violation of 21 U.S.C. §846 [Count 3]; possession of firearms in furtherance of a drug trafficking crime in violation of 18 U.S.C. §924(c)(1) and (2) [Count 4]; aiding and abetting in a criminal enterprise by kidnapping "Victim B" in violation of 18 U.S.C. §1959(a)(1) and (2) [Count 5];

---

[2] Several of the motions made by the defendants were filed prior to the issuance of the Superceding Indictment. The Superceding Indictment did not add defendants or charges. The government has represented that there are no substantive differences between the original indictment and the Superceding Indictment and that the Superceding Indictment "corrected" some language as to Counts 10 and 13, and Racketeering Act Two . In addition, there are no "special findings" because the United States Attorney General has determined not to seek the death penalty in this matter. (Docket No. 167 at 5). Thus, the parties have agreed that the motions filed prior to the issuance of the Superceding Indictment apply equally to the Superceding Indictment. (Docket No. 167 at 6). It does not appear that the changes between the original indictment and the Superceding Indictment impact the analysis of any of the pending motions. To the extent that the parties refer to the "indictment" in any motion filed prior to the Superceding Indictment, the Court has construed such argument or reference to relate to the Superceding Indictment.

conspiracy to delay and affect commerce by robbery and extortion of assets in violation of 18 U.S.C. §§ 1951 and 2 (the "Hobbs Act") [Count 6]; and using, carrying and brandishing a firearm in relation to crimes of violence in violation of 18 U.S.C. §924(c)(1)(A)(ii) and 2 [Count 7].

Defendant Rose is charged with the possession and distribution of marijuana in violation of 21 U.S.C. §841(a)(1) [Count 8]; and conspiracy to possess and distribute marijuana in violation of 21 U.S.C. §841(a)(1) [Count 9]. Defendants Eldridge and Speed are charged with the murder of Thedrus Laster in violation of 18 U.S.C. §1959(a)(1) and 2. [Count 10]. Defendants Eldridge, Speed and Rose are charged with conspiracy to delay and affect commerce by the robbery and extortion of Laster in violation of 18 U.S.C. §§ 1951 and 2 [Count 11]; the use, possession and discharge of a firearm in violation of 18 U.S.C. §924(c)(1)(A)(iii) and that in the course of this violation the three defendants caused the death of Laster in violation of 18 U.S.C. §§ 924 (c)(1)(A)(iii), 924 (j)(1) and 2 [Count 12]. Defendants Eldridge and Allen are charged with the murder of Jones in violation of 18 U.S.C. §1959(a)(1) and 2 [Count 13].

Defendants Eldridge, Speed and Allen are charged with conspiracy to delay and affect commerce by the robbery and extortion of Jones in violation of 18 U.S.C. §§ 1951 and 2 [Count 14]. Defendants Eldridge and Allen are charged with the use, possession and discharge of a firearm in violation of 18 U.S.C. §924(c)(1)(A)(iii) and that in the course of this violation the three defendants caused the death of Jones in violation of 18 U.S.C. §§ 924 (c)(1)(A)(iii), 924 (j)(1) and 2 [Count 15]. Finally, defendant Eldridge is charged with using, carrying and discharging a firearm in relation to a drug trafficking crime in violation of 28 U.S.C. §§ 924(c)(1)(A)(iii) and 2 [Count 16]; and illegal possession of a firearm in violation of 18 U.S.C.

§§922(g)(1), 924(a)(2) and 2 [count 17].

Speed Proffer Agreement

Defendant Speed seeks documents relating to the Proffer Agreement pursuant to which Speed made statements to law enforcement officers on September 23, 2003. The defendant asserts that review of the Proffer Agreement is necessary to determine if the use of any statements made by Speed on that occasion would be in violation of the agreement. (Docket No. 78-1 at page 10). In addition, Speed seeks disclosure of all material pertaining to the identification of defendant Rose as being the "shooter" involved in the Laster murder. (Docket No. 101 at page 2). The government represents that it will produce the proffer agreement to the defendant (Docket No. 90 at page 19).

Eldridge Brady Request

Defendant Eldridge also has asserted additional requests under Brady v. Maryland, 373 U.S. 83 (1963). (Docket No. 88 at page 11). The government has represented that any related Brady material has been provided to counsel under cover of a separate letter. (Docket No. 96 at page 8). It appears that this issue is moot.

Rose Request for Documents Relating to Identification

Rose has requested production of documents relating to a purported identification procedure in which a witness was to have viewed a photograph and identified Rose as the individual who shot Laster. (Docket No. 99 at page 4). The government has represented that no

identification procedure was conducted due to the fact that the witness and Rose are alleged to know each other. (Docket No. 111 at page 3). Thus, this request is moot.

Eldridge Grand Jury Photo Request

Defendant Eldridge seeks disclosure of photographs of his body displayed to the Grand Jury reflecting his tattoos. (Docket No. 147 at page 3). He alleges that a witness has purportedly identified Eldridge by tattoos he allegedly sported. The basis for this assumption is not in the record. Eldridge seeks production of any photographs and or police reports regarding the "non or misidentification of Mr. Eldridge because of the absence of tattoos." (Docket No. 147 at page 3). The government asserts that the defendant's motion is "speculative." Further, the government points out that information is not exclupatory just because it is not affirmatively incriminating. Finally, the government states that it has made substantial Brady disclosures in this case and that it "is aware of its obligations in this regard." (Docket No. 150 at page 7). There is a presumption that grand jury proceedings are lawful and regular, (United States v. Torres, 901 F.2d 205, 232 (2d Cir.) (quoting Hamling v. United States, 418 U.S. 87, 139 n. 23, 94 S.Ct. 2887, 2918 n. 23, 41 L.Ed.2d 590 (1974), *cert*. denied, 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990)), and disclosure of grand jury proceedings is available only by order of the Court. (See Fed.R.Crim.P. 6(e)). A party seeking disclosure of grand jury proceedings bears the burden of establishing a "particularized need" or "compelling necessity" for such disclosure which outweighs the policy of grand jury secrecy. Douglas Oil Co. v. Petrol Stops Northwest, 441 U.S. 211, 99 S.Ct. 1667, 60 L.Ed.2d 156 (1979); Pittsburgh Plate Glass Co. v. United States, 360 U.S. 395, 400, 79 S.Ct. 1237, 1241, 3 L.Ed.2d 1323 (1959); In re Rosahn, 671 F.2d 690, 695 (2d Cir.1982). Unspecified

allegations of impropriety or mere speculation are not sufficient to satisfy this heavy burden. United States v. Calandra, 414 U.S. 338, 345, 94 S.Ct. 613, 618-19, 38 L.Ed.2d 561 (1974). Therefore, "review of grand jury minutes is rarely permitted without specific factual allegations of governmental misconduct." Torres, 901 F.2d at 233. The defendant has not met his burden to warrant disclosure of Grand Jury materials at this time. There is no evidence in the record that there was a "non-identification" or misidentification of Eldridge "because of the absence of tattoos." Thus, based upon the record before the Court, the exculpatory value of any speculative misidentification can not determined. The motion is denied without prejudice. The government is reminded, however, of its obligations under Brady.

Eldridge Search Warrant Request

Defendant Eldridge also sought disclosure of the search warrant application related to the search of 118 Homer Street. After *in camera* review, the Court directed that a redacted copy be disclosed to the defendant (Docket No. 167 at 126). Eldridge has confirmed that he has received the redacted materials. (Docket No. 168 at page 9). This issue is also moot.

Allen Request for Statement & Vehicle

Defendant Allen has moved to compel disclosure of two items: (1) a statement that Allen purportedly made to Buffalo Police Detective Mark Stambach shortly after the Jones homicide; and (2) the automobile that Allen was driving at the time Jones was murdered. (Docket No. 148). Allen asserts that at the time Jones was killed, Allen and Jones were having a conversation. Allen states that he was sitting in his vehicle and that Jones was standing next to

6

the vehicle while the two were conversing. Allen contends that he believes the assailants were attempting to kill him, not Jones, at the time of the shooting. (Docket No. 148 at ¶ 9). Allen states that he advised the police where he left the vehicle and that the police took the vehicle and have never returned it to him. (Docket No. 148 at ¶ 11). In an Order dated September 9, 2010, the Court directed the government to locate and produce this material (Docket No. 68 at page 4). As of the date of oral argument on the instant motion, August 8, 2012, the government represented that it has searched for the purported statement that Allen claims he made to Stambach but that no such statement can be found. (Docket No. 173 at 32). With respect to the automobile, the government represents that it has produced photographs of the vehicle reflecting that the vehicle was reviewed at by "Crime Scene" at the time of the shooting, but that the government has found no other information about the vehicle. In addition, the government states that it was not certain that the vehicle was registered to Allen, which may have impacted the disposition of the car. (Docket No. 173 at 31). The government is directed to file a written report outlining the current status with respect to efforts made to locate Allen's alleged statement and the vehicle within 15 days of the date of this Order.

Request for Grand Jury Transcripts & Particulars Regarding Laster Murder

The defendants have moved for disclosure of Grand Jury transcripts and also a Bill of Particulars relating to the information presented to the Grand Jury concerning the Murder of Laster. (Docket No. 99 at 4; Docket No. 101 at page 2; Docket No. 142 at page 7; Docket No. 143 at page 1; Docket No. 144 at page 5).

These requests all revolve around a perceived inconsistency as to which defendant is

7

alleged to have been the shooter with respect to the murder of Laster. Count 10 of the Superceding Indictment charges that Eldridge and Speed were members of the criminal enterprise, and that in furtherance of the racketeering activities of the enterprise, Eldridge and Speed caused the death of Laster in violation of 18 U.S.C. §1959(a)(1) and §2.[3] Count 12 of the Superceding Indictment alleges that Eldridge, Speed and Rose unlawfully used, carried and discharged firearms in violation of 18 U.S.C. §924(c) and that in the course of this violation "caused the death of a person," being Laster, in violation of 18 U.S.C. §924(c)(A)(iii), §924(j)(1) and §2. (Docket No. 164 at page 22-23). The Superceding Indictment does not state which of the three defendants is alleged to have been the actual shooter that killed Laster.

In response to the various requests for more information, the government has provided some particularization. In this regard the government stated:

> The government anticipates evidence related to the April 3, 2005, murder of Thedrus Laster will include, but will not be limited to, the following:
>
> (A) That defendants SPEED, ELDRIDGE, and ROSE all participated in the murder of Thedrus Laster;
>
> (B) That defendant ROSE called victim Thedrus Laster before the murder and was advised that victim Laster was going to an apartment located at 2108 Delaware Avenue;
>
> (C) That a burgundy Cadillac associated with defendant ROSE was used as a getaway car;
>
> (D) That two of the defendants, including defendant ELDRIDGE, entered the apartment with firearms;
>
> (E) That one of the defendants who entered the apartment shot and

---

[3] Rose was not named in Count 10 because Rose is not alleged to have been a member of the racketeering enterprise. (Docket No. 173 at page 45).

killed victim Thedrus Laster while the other individual held a witness in another room at gunpoint;

(F) That one of the defendants acted as a getaway driver and/or lookout while the other two were inside the apartment;

(G) That defendants ROSE, SPEED, and ELDRIDGE fled the scene;

(H) That defendant ROSE called both of victim Laster's cellular phones shortly after the murder of Laster;

(I) That defendant ROSE was interviewed by the Buffalo Police Department and, in pertinent part, admitted that he sold marijuana for victim Thedrus Laster, that he drove past Laster's apartment the night of the murder, and that he called Laster's phones the night of the murder;

(J) That ROSE admitted to a witness who the government intends to call at trial that he "took Flap out;"

(K) That SPEED admitted to a witness who the government intends to call at trial that "he and Damu put that work in on Flap;"

(L) That ELDRIDGE admitted to a witness who the government intends to call at trial, in sum and substance, that Kashika staked out the victim...Damu and Kashika wore black and waited in the bushes...the victim resisted so they killed him... G was the getaway driver.

(Docket No. 152 at page 6).

Further, the respective requests for the transcripts relating to the information presented to the Grand Jury in connection with the Laster murder are moot inasmuch as the government has produced the relevant transcripts of the sole witness allegedly present at the time of the Laster murder. The redacted transcript reflects that the witness advised the Grand Jury: that Laster was making "a couple thousand" dollars a week selling marijuana; that the witness was with Laster on April 3, 2005 (the date of Laster's murder); that Rose called Laster on his cell phone (the

witness was standing with Laster when he took the call) (Docket No. 190-1 at page 3); that Laster advised Rose that he was about to go home (Docket No. 190-1 at page 4); that the witness arrived at Laster's apartment before Laster got there, and that the witness waited for Laster inside the apartment; that the witness heard Laster arrive and went to open the kitchen door for him; that at that time the witness observed that Laster was between two other men with guns (Docket No. 190-1 at page 5); that the first guy entered the apartment and pointed a gun at the witness's head; the witness described this individual as 5'9", dark skin, thick eyebrows, low haircut and gold rimmed glasses, with a mask on his face which covered his nose and mouth (Docket No. 190-1 at page 6); that the second person to come into the apartment was Laster, who the witness described as being 5'10" - 5'11" tall and 230 to 250 pounds (Docket No. 190-1 at page 7); that there was a third person behind Laster but that the witness did not see that individual's face; the third person was bigger than Laster[4]; the witness observed the complexion and braids of the third individual; that the witness was rushed into the front room; that the gun pointed to the witness's head was "a long silver gun," either a 25-caliber or a 9-millimeter; that the person holding the gun to the witness's head made the witness get on the witness's hands and knees (keeping the gun to the back of the witness's head); that the witness then heard a gunshot from the kitchen; that the person holding a gun to the witness's head left the witness on the floor and went into the kitchen (Docket No. 190-1 at pages 10-11); that the witness opened the front door and ran out of the house. (Docket No. 190-1 at page 11); that on the day of the murder the witness gave a statement to homicide detectives to the effect that the person who shot Laster was Galen Rose;

---

[4] Although the witness testified that the third individual was "bigger" than Laster, the witness also testified that the third individual was 5'7"-5'8" and thus, shorter than Laster. (Docket No. 190-1 at page 9).

(Docket No. 190-1 at pages 11-12); that Laster and Rose had a business relationship relating to the sale of marijuana; that there had been a business dispute between Laster and Rose; that notwithstanding the witness's prior statement to the police that Rose was the person who shot Laster, the witness testified to the Grand Jury that the witness did not recognize the person who shot Laster to have been Rose; that the witness explained that the only thing the witness was able to see were braids and somebody a little shorter than Laster; that at that time Rose had braids, was shorter and heavier than Laster; that the witness thought Rose was involved because he was the last one on the phone with Laster. (Docket No. 190-1 at pages 12-13). The government asserts that it did not make an opening statement or summation to the Grand Jury stating a theory that a specific individual shot Laster (Docket No. 173 at page 45). The government further notes that in Counts 10 and 12 the Grand Jury indicted the three individuals under 18 U.S.C. §2, which provides for criminal liability for aiding and abetting. (Docket No. 173 at page 46). Finally, the government argues that it does not have to establish the identity of the person that actually shot Laster, citing United States v. Concepcion, 983 F.2d 369, 383 (2d Cir. 1993). In Concepcion, the Court held that §2(b) adopts the "general principal of causation in criminal law that an individual (with the necessary intent) may be held liable if he is a cause in fact of the criminal violation, even though the result which the law condemns is achieved through the actions of innocent intermediaries." Thus, the Second Circuit held that an individual could be held liable under 18 U.S.C. §2(b) for a violation of 18 U.S.C. §1959 even if the government cannot identify the person who actually killed the victim involved. Concepcion, 983 F2d at 383-384. The record does not support the defendants' assertion that the government has impermissibly changed its theory as to the identity of the individual who killed Laster. Because the trial in the instant case

11

has not taken place, no trial theory has yet been proffered. The Grand Jury transcript does not reflect that the government made a presentation to the Grand Jury as to the specific identity of the person who shot Laster. In any event, the Second Circuit rejected a similar claim in Concepcion. There, the prosecution had argued in its opening and summation that Concepcion had himself killed the victim. During the summation, the government asserted that the jury could also find that Concepcion was guilty under an aiding and abetting theory. The defendants argued that the prosecution had impermissibly changed its theory. The Court rejected this argument, stating that "[b]y citing § 2, the indictment gave Concepcion notice that the government could proceed on the premise that he had violated § 1959 by aiding and abetting." Concepcion, 983 F2d at 392 citing United States v. Miller, 471 U.S. 130, 134, 105 S.Ct. 1811, 1814, 85 L.Ed.2d 99 (1985) (no prejudice where defendant received "notice that [a particular] offense was charged and would need to be defended against").

The record does not reflect the inconsistencies asserted by the defendants. Based on the particularization provided by the government, as well as the representation that the government intends to prove aiding and abetting liability under 18 U.S.C. §2 and disclosure of the Grand Jury testimony as to the sole witness to the Laster murder, the defendants are on notice of the government's theory as to the Laster murder sufficient so that they can avoid surprise at trial. The various requests for further particularization or other material relating to the charges based upon the Laster murder are denied.

The Government's Motion to Compel Line-Up

The government has filed a motion to compel Eldridge to appear in a line-up (Docket No. 81). The government seeks to have Eldridge appear in a line-up because the witness who made the October 22, 2010 identification stated that to be certain of the identification, the witness would have to "see him in person." The defendant opposes the motion to compel the line-up arguing that any resultant identification may be more unreliable because the witness may simply recognize the defendant from the photo array as opposed to the purported opportunity to observe him during the incident in 2005. (Docket No. 88 at page 10). The defendant asserts that should the Court allow the government to arrange for a line-up, any such line-up should be conducted in a sequential "double blind" manner wherein the person conducting the procedure does not know who the defendant is and the witness does not know whether the suspect will be displayed at all or the number of individuals to be sequentially displayed. (Docket No. 88 at page 10).

The Supreme Court has held that it is permissible to compel the accused to appear in a line-up. In <u>United States v. Wade</u>, 388 U.S. 218 (1967), the Court stated:

> We have no doubt that compelling the accused merely to exhibit his person for observation by a prosecution witness prior to trial involves no compulsion of the accused to give evidence having testimonial significance. It is compulsion of the accused to exhibit his physical characteristics, not compulsion to disclose any knowledge he might have. It is no different from compelling Schmerber to provide a blood sample or Holt to wear the blouse, and, as in those instances, is not within the cover of the privilege. Similarly, compelling Wade to speak within hearing distance of the witnesses, even to utter words purportedly uttered by the robber, was not compulsion to utter statements of a 'testimonial' nature; he was required to use his voice as an identifying physical characteristic, not to speak his guilt. We held in <u>Schmerber</u>, 384 U.S. at 761, 86 S.Ct. at 1830, that the distinction to be drawn under the Fifth Amendment privilege against self-incrimination is one

13

> between an accused's 'communications' in whatever form, vocal or physical, and 'compulsion which makes a suspect or accused the source of 'real or physical evidence," Schmerber, [384 U.S.] at 764, 86 S.Ct. at 1832. We recognized that 'both federal and state courts have usually held that * * * (the privilege) offers no protection against compulsion to submit to fingerprinting, photography, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture.' Id., at 764, 86 S.Ct. at 1832. None of these activities becomes testimonial within the scope of the privilege because required of the accused in a pretrial lineup.

Wade, 388 U.S. at 222-223. See also United States v. Doe, 457 F.2d 895 (2d Cir 1972)(Use of process to compel furnishing of handwriting or voice exemplars to a grand jury does not constitute a "search or seizure" within Fourth Amendment); In re Grand Jury Proceedings, 873 F.2d 238 (9th Cir. 1989)(A court may compel a suspect to provide a handwriting exemplar; to provide a voice exemplar; to stand in a lineup [citing In re Pantojas, 628 F.2d 701, 704 (1st Cir.1980)]; and to provide fingerprints).

In light of the witness's statement that the witness may be able to make a more certain identification if the witness were able to view Eldridge in person, the government has demonstrated good cause for the line-up. The government's motion to compel defendant Eldridge to appear in a line-up is granted. The Court declines to adopt the parameters for the line-up as suggested by the defendant inasmuch as the defendant has not presented any legal authority supporting such a restrictive line-up procedure. The government, however, assumes the risk to ensure that any line-up procedure utilized is not suggestive or does not otherwise compromise the witness's ability to make an in-court identification of the defendant.

Severance of Counts and Defendants

Defendant Speed argues that Counts 16 and 17 should be severed from the trial relative to the other charges in the indictment. (Docket No. 78-1 at page 2). Count 16 alleges that Eldridge knowingly and unlawfully used, carried or discharged a firearm in relation to a drug trafficking crime on September 21, 2005. Speed asserts that this charge relates to an incident in which Eldridge shot at a Buffalo Police Officer. (Docket No. 78-1 at page 3). Count 17 charges Eldridge with unlawful possession of a firearm (a Hi Point 9mm handgun). Speed asserts that Eldridge's DNA was found on the gun that was found near the location at which shots were fired at a Police Officer. Speed argues that the inclusion of the non-RICO charges against Eldridge, Speed's RICO associate, would prejudice Speed's defense. Further, Speed argues that Eldridge's statement that "he touches a lot of guns," made to police officers in connection with a December 8, 2005 arrest, is not admissible as a co-conspirator statement and its admission at trial would violate Speed's right to confrontation.[5]  Speed also seeks to sever his trial from that of defendant Rose because Rose will likely present an antagonistic defense that Rose is innocent of the Flap homicide. (Docket No. 78-1 at page 5).

Defendant Rose also seeks severance as to Counts 8, 9, 11 and 12 of the indictment alleging that he would be prejudiced by the spillover from evidence introduced with respect to the other counts which are not asserted against him. (Docket No. 79 at pages 4-5; Docket No. 99 at pages 2-5).

Defendant Eldridge also seeks to sever his trial from that of his co-defendants. In

---

[5]  The government has represented that it will not attempt to introduce any of the statements made by Eldridge as a result of his December 8, 2005 arrest. Thus, this basis for the motion to sever appears to be moot.

15

addition, Eldridge seeks to sever any trial relating to Counts 16 and 17 from the remainder of the counts. (Docket No. 80 at pages 10-11).

In any event, a motions to sever counts or defendants for trial are better resolved by the District Judge with plenary jurisdiction over the trial in this case. Thus, on these motions this Court defers to the District Judge.

Motion for DNA Sample

The government also moves to compel defendant Speed to provide a DNA sample. (Docket No. 82). The government asserts that DNA "swabs" have been obtained from various items of evidence in this case. For example, DNA was recovered from a walkie-talkie found at or near the scene of the Laster murder. Testing of that DNA sample indicates a mixture of at least five unknown individuals. The Erie County Central Police Service report represents that a known sample is needed for further comparison. (Docket No. 84 at page 1-2).

On June 3, 2013, the Supreme Court determined that police officers can take a DNA sample of an individual where probable cause existed to arrest an individual for a serious crime without any further showing of reasonable suspicion or probable cause relating to the need for a DNA sample. <u>King</u>, — U.S. —, 2013 WL 2371466 (2013). The Court compared the taking of DNA under such circumstances to a search incident to an arrest. In this regard, the Court stated that "[w]hen probable cause exists to remove an individual from the normal channels of society and hold him in legal custody, DNA identification plays a critical role in serving those interests." <u>King</u>, 2013 WL 2371466 at *10. The Supreme Court also held that the taking of a DNA sample is analogous to the taking of fingerprints, stating: "DNA identification is an advanced technique

16

superior to fingerprinting in many ways, so much so that to insist on fingerprints as the norm would make little sense to either the forensic expert or a layperson. The additional intrusion upon the arrestee's privacy beyond that associated with fingerprinting is not significant, ... and DNA is a markedly more accurate form of identifying arrestees. A suspect who has changed his facial features to evade photographic identification or even one who has undertaken the more arduous task of altering his fingerprints cannot escape the revealing power of his DNA." King, 2013 WL 2371466 at *16. While the Supreme Court did not directly address the fact that the use of a DNA sample to identify an individual may also inculpate that individual, the fact that fingerprints have commonly been used for such purposes. It is unlikely that the Supreme Court was not mindful of the fact that a DNA sample taken upon arrest for identification purposes may be used to inculpate the accused of the crime for which he was arrested.

Prior to King, it was unsettled whether a request for a DNA sample must be supported by reasonable suspicion or probable cause. "Where a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, ... reasonableness generally requires the obtaining of a judicial warrant [and] ... the showing of probable cause required by the Warrant Clause." Vernonia School District 47J v. Acton, 515 U.S. 646, 653 (1995). Nevertheless, "under certain circumstances, searches and seizures may be permissible under the Fourth Amendment 'based on suspicions that, although 'reasonable,' do not rise to the level of probable cause.' " In re Shabazz, 200 F.Supp.2d 578, 583 (D.S.C.2002) (*quoting* New Jersey v. T.L.O., 469 U.S. 325, 341, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985)). United States v. Owens, 2006 WL 3725547, *15 (W.D.N.Y.2006) (Arcara, J.) ("individualized suspicion that does not rise to probable cause can justify a search in circumstances presenting less substantial privacy interests when balanced

17

against the public interest in conducting such searches"). Even if King did not alleviate the need for such a showing, probable cause exists to support the request for a DNA sample in this case. Upon consideration of the various allegations contained in the Superceding Indictment, as well as the additional information in the record, including the proffer of the evidence relating to the Laster murder and the Grand Jury testimony disclosed by the government, the Court finds that probable cause exists warranting an Order directing that Speed provide buccal swab DNA samples to the government for the purpose of determining whether such DNA matches DNA found at the scene of the Laster murder. The defendant argues that the government should not have *"carte blanche"* to utilize Speed's DNA with respect to evidence aside from the purposes identified by the government in support of the instant motion. In this regard, the defendant seeks an Order requiring the government to give notice to the defendant of each DNA comparison it intends to conduct utilizing Speed's DNA. (Docket No. 86 at page 6). The defendant does not cite any authority for such a requirement. The Court declines to impose this burden upon the government, particularly in light of King.

The government's motion directing Speed to provide buccal swab DNA samples to the government is granted.

So Ordered.

                                                           */s/ Hugh B. Scott*
                                                United States Magistrate Judge
                                                Western District of New York

Buffalo, New York
June 12, 2013